FILED

$B\lambda$

# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION

UNITED STATES OF AMERICA *ex rel.*
JAMES F. ALDERSON,

Plaintiffs,

v.

QUORUM HEALTH GROUP, INC., QUORUM HEALTH
RESOURCES, LLC, ON ITS OWN BEHALF AND AS
SUCCESSOR TO HCA MANAGEMENT COMPANY AND
QUORUM HEALTH RESOURCES, INC., QUORUM
HEALTH RESOURCES, INC., HCA MANAGEMENT
COMPANY, BARBERTON HEALTH SYSTEM LLC, BATON
ROUGE HEALTH SYSTEM LLC, CLINTON COUNTY
HEALTH SYSTEM LLC, IOM HEALTH SYSTEM, L.P.,
MARY BLACK HEALTH SYSTEM LLC, MASSILLON
HEALTH SYSTEM LLC, MIDLANDS MEDICAL
ASSOCIATES, L.P., NC-CCH, INC., NC-CNH, INC., N/K/A
QHG GEORGIA HOLDINGS, INC , NC-CRMC, INC.,
NC-CSH, INC., NC-DSH, INC., NC-MGH, INC., N/K/A QHG
GEORGIA HOLDINGS, INC., NC-PSH, INC., NC-SCHC,
INC., NC-SCHI, INC., QHG OF JACKSONVILLE, INC., QHG
OF TEXAS, INC., QHG OF MINOT, INC., QHG OF OHIO,
INC., QHG OF GADSDEN, INC., QHG OF LAKE CITY, INC.,
QHG OF SPRINGDALE, INC., QHG OF KENMARE, INC.,
QHG OF ALABAMA, INC., QHG OF SOUTH CAROLINA,
INC., QHG OF ENTERPRISE, INC., ST. JOSEPH HEALTH
SYSTEM LLC, VICKSBURG HEALTHCARE, LLC, RIVER
REGION MEDICAL CORP., WESLEY HEALTH SYSTEM
LLC, ABILENE REGIONAL MEDICAL CENTER,
BARBERTON-CITIZENS HOSPITAL, BATES MEDICAL
CENTER, CAROLINAS HOSPITAL SYSTEM, CLINTON
COUNTY HOSPITAL, DOCTORS HOSPITAL OF STARK
COUNTY, FLOWERS HOSPITAL, GADSDEN REGIONAL
MEDICAL CENTER, JACKSONVILLE HOSPITAL,
KENMARE HOSPITAL, KINGSTREE HOSPITAL, LAKE
CITY COMMUNITY HOSPITAL, LUTHERAN MEDICAL
CENTER, MARY BLACK HOSPITAL, MEDICAL CENTER
OF ENTERPRISE, NORTHWEST MEDICAL CENTER,
PARK MEDICAL CENTER, PARKVIEW REGIONAL
MEDICAL CENTER, ST. JOSEPH MEDICAL CENTER,
SUMMIT HOSPITAL, UNIMED MEDICAL CENTER,
VICKSBURG MEDICAL CENTER, and WESLEY MEDICAL
CENTER,

Defendants.

Case No.

*99-413-CIV-T-24B*

**PLAINTIFFS UNITED
STATES' AND
RELATOR JAMES F.
ALDERSON'S
COMPLAINT**

*1*

# TABLE OF CONTENTS

I.      NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II.     JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

III.    VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

IV.     PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

V.      FALSE CLAIMS ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

VI.     THE MEDICARE PROGRAM . . . . . . . . . . . . . . . . . . . . . . . . . . -6-

VII.    PREPARATION OF THE MEDICARE COST REPORT . . . . . . . . . . . . -9-

VIII.   APPLICABLE INSTRUCTIONS . . . . . . . . . . . . . . . . . . . . . . . . -15-

IX.     FALSE CLAIMS AND FALSE STATEMENTS TO MEDICARE . . . . . . . -19-

X.      FALSE CLAIMS AND FALSE STATEMENTS TO MEDICAID . . . . . . . . -24-

XI.     FALSE CLAIMS AND FALSE STATEMENTS TO TRICARE/CHAMPUS
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

XII.    IDENTIFICATION OF HOSPITALS, PERSONNEL, AND DATES . . . . -30-

XIII    NON-ALLOWABLE COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-
        A.    Personal Comfort Items . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
        B.    Advertising Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-
        C.    Non-allowable Meals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-
        D.    Physician Billing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-
        E.    Legal Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-

XIV.    CAPITAL RELATED COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-
        A.    Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-
        B.    Interest Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -47-

XV.     HOSPITAL-BASED PHYSICIAN HOURS . . . . . . . . . . . . . . . . . . -50-

XVI.    SHIFTING INPATIENT COSTS TO OUTPATIENT COSTS . . . . . . . -51-

XVII.   HOSPITAL-BASED SUBPROVIDERS . . . . . . . . . . . . . . . . . . . . . -53-

XVIII.    BAD DEBTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    -54-

XIX.    IMPROPER STATISTICS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    -58-

XX.    NON-REIMBURSABLE COST CENTERS . . . . . . . . . . . . . . . . . . . . . . .    -60-

XXI.    MANIPULATION OF COST CENTERS . . . . . . . . . . . . . . . . . . . . . . .    -63-

XXII.    ADDITIONAL EXHIBITS TO PLAINTIFFS' COMPLAINT . . . . . . . . . . .    -65-

XXIII.    DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    -67-

CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    -68-
         FIRST CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    -68-
         SECOND CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    -69-
         THIRD CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    -69-
         FOURTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . .    -70-
         FIFTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    -70-
         SIXTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    -71-
         SEVENTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . .    -71-
         EIGHTH CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    -72-

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    -73-

For their complaint, the United States of America ("United States") and the relator, James F. Alderson ("Relator"), collectively "plaintiffs," allege as follows:

## I. NATURE OF ACTION

1       Plaintiffs bring this action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33. The United States also brings this action to recover all available damages and other monetary relief under the common law or equitable theories of fraud, unjust enrichment, payment under mistake of fact, recoupment of overpayments and disgorgement of illegal profits.

2.      These claims are based upon defendants' false claims and false statements made in connection with the submission of their owned or managed hospitals' cost reports to the Medicare, Medicaid, and CHAMPUS programs in order to obtain payment from January 1, 1985 through the present.

3       Simply put, the defendants, in accordance with established, written company policies or practices, regularly and routinely prepared a second "reserve" set of Medicare cost reports, workpapers and summaries that defendants actively concealed from, or failed to disclose to, Medicare, Medicaid, and CHAMPUS program auditors.

4.      This reserve set of cost report records included, as a matter of company policy or practice, cost information related to reimbursement requests contained in the filed cost report that defendants knew probably would be denied or disallowed if discovered by government auditors.

5.      Defendants' concealment of, or failure to disclose, the information contained in

-1-

their reserve sets of cost report records violated defendants' certifications that the filed

Medicare cost report "is a true, correct, and complete report prepared from the books and

records of the provider in accordance with applicable instructions," as required by federal law

and regulation. 42 C.F.R. § 413.24(f)(4)(iv).

## II.    JURISDICTION

6.    This Court possesses subject matter jurisdiction to entertain this action under

28 U.S.C. §§ 1331 and 1345. The Court possesses supplemental jurisdiction to entertain the

common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a). The Court may

exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) and

because at least one of the defendants resides or transacts business in this District.

## III.   VENUE

7.    Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C.

§ 1391(b) and (c) because at least one of the defendants resides or transacts business in this

District.

## IV.    PARTIES

8.    The United States brings this action on behalf of its agencies, the Department

of Health and Human Services ("HHS"), and its component, the Health Care Financing

Administration ("HCFA"), on behalf of the Medicare and Medicaid programs, and the

Department of Defense, on behalf of the Civilian Health and Medical Program of the

Uniformed Services ("CHAMPUS"), now known as TRICARE.

9.    Plaintiff and relator, James F. Alderson, is a resident of Vancouver,

Washington and a former employee of North Valley Hospital, Inc., in Whitefish, Montana, which was managed by defendant Quorum Health Resources, Inc.. Mr. Alderson brings this action for violations of 31 U.S.C. §§ 3729 et seq., on behalf of himself and the United States Government pursuant to 31 U.S.C. § 3730(b)(1)

10      Defendant Quorum Health Group, Inc. ("QHG"), through its subsidiaries, owns and operates acute care hospitals. QHG is a spin-off of Hospital Corporation of America ("HCA"), which previously was a Tennessee corporation, having its principal place of business in Nashville, Tennessee. QHG was formed in 1989 in order to purchase HCA's subsidiary, HCA Management Company.

11.      Defendant QHG is a Delaware corporation, having its principal place of business in Brentwood, Davidson County, Tennessee. As of January 21, 1999, QHG, through its subsidiaries, owned and operated twenty-three acute care hospitals in nine states. During the time period applicable to this complaint, QHG, through its subsidiaries, owned an additional twelve hospitals located in six more states, for a total of thirty-five hospitals located in fifteen states  QHG transacts business in the Middle District of Florida.

12.      Defendant Quorum Health Resources, LLC ("QHR"), is a wholly-owned subsidiary of defendant QHG. QHR is a Delaware corporation, having its principal place of business in Brentwood, Davidson County, Tennessee. Defendant QHR is the successor in interest to, and responsible for, the liabilities of HCA Management Company.

13.      Prior to its restructuring as Quorum Health Resources, LLC, QHR was Quorum Health Resources, Inc., a Delaware corporation having its principal place of business

-3-

in Brentwood, Davidson County, Tennessee  QHR today provides management services to a broad variety of hospitals and health care providers throughout the United States.  It is the nation's largest hospital management company.

14.     During the time period relevant to this complaint, QHR managed at least 178 acute care hospitals in 38 states, including hospitals located in the Middle District of Florida QHR does business in the Middle District of Florida.

15.     QHR's management services business consists of managing hospitals owned by others.  QHR's hospital management contracts generally provide that QHR will provide management services for a term of three to five years.  Through 1995, these services included the preparation and submission of its managed hospitals' cost reports to federal and state authorities, and the preparation of reserve cost reports for those hospitals.

16.     QHR develops a management plan for each managed hospital and provides the hospital with a hospital administrator and chief financial officer.  The hospital administrator and chief financial officer of each managed hospital are employees of QHR and authorized agents of the managed hospitals.

17.     Attached hereto as Exhibit 1, and incorporated by reference herein, is a chart listing all thirty-five current and former Quorum-owned hospitals, with the hospital name, owner, address, Medicare Provider Number, the date the hospital was acquired and, where applicable, the date the hospital was sold.  All of the owners of Quorum hospitals are or were subsidiaries of QHG

18.     Plaintiffs name as defendants all QHG subsidiaries that own (or owned)

-4-

hospitals (where known to plaintiffs), and the hospitals they own, with the exception of the

hospitals that have been sold. With regard to the sold hospitals, plaintiffs name the QHG

subsidiary or subsidiaries that owned the hospitals and QHG as defendants for the period the

hospitals were owned by QHG. Hereafter, for convenience, QHG, QHR, the QHG

subsidiaries that own or owned hospitals, and the hospitals owned by these entities will be

collectively referred to as Quorum.

## V.    FALSE CLAIMS ACT

19.    The False Claims Act ("FCA") provides, in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be
> presented, to an officer or employee of the United States
> Government or a member of the Armed Forces of the United
> States a false or fraudulent claim for payment or approval; (2)
> knowingly makes, uses, or causes to be made or used, a false
> record or statement to get a false or fraudulent claim paid or
> approved by the Government; . . . or (7) knowingly makes,
> uses, or causes to be made or used, a false record or statement
> to conceal, avoid, or decrease an obligation to pay or transmit
> money or property to the Government,
>
> * * *
>
> is liable to the United States Government for a civil penalty of
> not less than $5,000 and not more than $10,000, plus 3 times
> the amount of damages which the Government sustains because
> of the act of that person . . . .
>
> (b) For purposes of this section, the terms "knowing" and
> "knowingly" mean that a person, with respect to information (1)
> has actual knowledge of the information; (2) acts in deliberate
> ignorance of the truth or falsity of the information; or (3) acts in
> reckless disregard of the truth or falsity of the information, and
> no proof of specific intent to defraud is required

31 U.S.C. § 3729.

## VI.   THE MEDICARE PROGRAM

20.     In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare"

or the "Medicare Program") to pay for the costs of certain health services and health care.

Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.

See 42 U.S.C. §§ 426, 426A.  Part A of the Medicare program authorizes payment for

institutional care, including hospital, skilled nursing facility and home health care.  See 42

U.S.C. §§ 1395c-1395i-4.  Most hospitals, including all of defendants' owned and managed

hospitals, derive a substantial portion of their revenue from the Medicare program.

21      Prior to October 1983, Medicare reimbursements were based on the

"reasonable cost" of inpatient services provided to Medicare beneficiaries.  Under the

reasonable cost payment system, providers were reimbursed for the actual costs they incurred,

provided that the costs fell within certain cost limits.  42 U.S.C. § 1395f(b).  Thus, as hospital

costs increased, so too did Medicare reimbursements to those hospitals.

22.     Concerned about escalating Medicare expenditures, Congress in 1983 revised

the scheme for reimbursing inpatient hospital costs by establishing the prospective payment

system ("PPS").  Under PPS, most hospitals, including defendants' owned and managed

hospitals, are paid on the basis of prospectively determined fixed rates, which vary according

to the type and category of hospital treatment received.  42 U.S.C. § 1395ww(d)  The

specific rate to be paid depends upon which diagnosis related group ("DRG") best

characterizes the patient's condition and treatment.  Id.

23.     After 1983, hospitals could request that Medicare exempt them from the PPS

system and permit them to remain under the reasonable cost reimbursement system.  In addition, by statute, some specialty hospitals, including psychiatric hospitals, are exempt from PPS   42 C.F.R. §§ 412.20, 27

24.   Because PPS reimbursement does not apply to outpatient hospital costs or the costs of certain hospital subproviders, including home health agencies ("HHAs") — which are reimbursed on the basis of the provider's represented costs — providers have an incentive to assign costs to outpatient areas and to cost-based subproviders such as HHAs, whether or not they properly belong there, in order to obtain more Medicare reimbursement than they would have had the costs been properly assigned to the inpatient areas covered by the fixed rate PPS

25.  Medicare has been in the process of phasing in PPS reimbursement for hospital capital costs (such as the costs of buildings and equipment) during the 1990s  Prior to cost reporting periods beginning on or after October 1, 1991, Medicare reimbursed hospitals for their capital costs on a pass through or cost basis — in other words, Medicare reimbursed the full amount of a hospital's capital costs attributable to care provided to Medicare beneficiaries. The phase-in of PPS reimbursement for capital costs began for cost reporting periods beginning on or after October 1, 1991 and will be completed as of cost reporting periods beginning on or after October 1, 2001.  During the phase-in period hospitals are reimbursed for capital costs based both on national rates and their actual costs.  For cost report periods beginning on or after October 1, 1991 hospitals were reimbursed their capital costs as 90% based on cost and 10% based on national rates.  For  each subsequent year the percentage of national rates has and will go up by 10%.  42 C.F.R. § 412.304.

26.     During the time period relevant to this complaint hospitals had an incentive to characterize costs as capital costs, regardless of whether they should be so characterized, in order to increase Medicare reimbursement.

27.     HHS is responsible for the administration and supervision of the Medicare program.  HCFA is a division of HHS and is directly responsible for the administration of the Medicare program.

28      To assist in the administration of Medicare Part A, HCFA contracts with "fiscal intermediaries " 42 U.S.C. § 1395h.  Fiscal intermediaries typically are insurance companies that provide a variety of services, including processing and paying claims and auditing cost reports.

29.     During the year, providers, such as hospitals, submit claims to their assigned fiscal intermediaries for reimbursement, based upon the number of hospital stays for Medicare beneficiaries.  42 C.F.R. §§ 413.1, 413.60, 413.64.  Providers receive payments on these claims, known as "interim payments."  Within a specified time after the end of the year, the hospital must submit its cost report to its fiscal intermediary so that the fiscal intermediary can make year-end adjustments to the amounts paid to the hospital, as needed   42 C.F R § 413 20(b).

30      Cost reports contain specific financial data relating to the provider, most importantly the reimbursable costs it expended to care for Medicare patients.  Hence,  the cost report forms the basis for a determination by Medicare whether the provider is entitled to more  reimbursement than already paid it in the interim payments, or whether the provider has

-8-

been overpaid and must reimburse Medicare.  42 C.F.R. §§ 405.1803, 413.60 and

413 64(f)(1)

31.    Hospitals owned by Quorum and hospitals managed by QHR and HCA

Management Company were, at all times relevant to this complaint, required to submit cost

reports to their fiscal intermediaries.

32.    Under the rules applicable at all times relevant to this complaint, Medicare,

through its fiscal intermediaries, had the right to audit the cost reports and financial

representations made by all of defendants' owned and managed hospitals to ensure their

accuracy and preserve the integrity of the Medicare Trust Funds.  This right includes the right

to make retroactive adjustments to cost reports previously submitted by a provider if any

overpayments had been made.  42 C.F.R. § 413.64(f)

## VII.    PREPARATION OF THE MEDICARE COST REPORT

33.    HCFA requires hospitals, as a prerequisite to payment by Medicare, to submit

annually a form HCFA-2552, titled the "Hospital and Hospital Health Care Complex Cost

Report" ("Hospital Cost Report").  A sample cost report is attached hereto as Exhibit 2.

34.    HCFA periodically revises the form HCFA-2552, and a given version is

indicated by inclusion of the date and year in the form title of the revised version.  For

example, the attached form HCFA-2552 is for hospital cost reporting periods ending on or

after September 30, 1996.  See Exhibit 2.

35    To complete a Hospital Cost Report,  the provider must review and submit a

substantial amount of information to the fiscal intermediary

36.     Before completing the Hospital Cost Report, a provider reviews its own books and records.  The provider then breaks down its costs into a trial balance of expenses.

37.     The Hospital Cost Report contains four major parts or Worksheets.

38.     First, the provider completes Worksheet A of the Hospital Cost Report, titled the "Reclassification and Adjustment of Trial Balance of Expenses."  See pages 6-11 through 6-24 of Exhibit 2   Worksheet A starts with the provider's trial balance of expenses.  The provider's trial balance of expenses includes all of the provider's costs whether they are allowable or  unallowable for Medicare reimbursement purposes.

39.     The provider then reclassifies the trial balance of expenses in accordance with the Medicare statute, regulations and HCFA program instructions.  For example, a provider must reclassify interest expense on borrowings between the interest on those funds borrowed for capital-related purposes and those funds borrowed for working capital purposes because interest on funds borrowed for capital are reimbursed at a higher rate than interests on funds borrowed for working capital.

40     Next, a provider makes certain adjustments on Worksheet A also in accordance with the Medicare statute, regulations and HCFA program instructions in order to separate out its costs which are nonallowable for Medicare reimbursement purposes.  For instance, Medicare does not reimburse a provider for lobbying costs, which must be adjusted out of Worksheet A.  Thus, Worksheet A consists of all of the provider's reclassifications and adjustments of costs.

41.     Second, the provider fills out Worksheet B of the Hospital Cost Report, titled

-10-

"Cost Allocation"  See pages 6-25 through 6-60 of Exhibit 2.  A provider has to allocate

(assign) all of its allowable overhead costs, such as housekeeping or depreciation, to all its

revenue producing cost centers, such as operating rooms or laboratories.

42      Third, the provider prepares Worksheet C of the Hospital Cost Report, titled

"Computation of Ratio of Costs to Charges."  See pages 6-62 through 6-65 of Exhibit 2.

Charges are the amounts billed throughout the year to Medicare and non-Medicare patients

for services rendered.  Since Medicare reimburses hospitals based (in part) on their costs, the

hospitals need to compute this ratio to determine whether Medicare charges have covered

Medicare costs.  On Worksheet C, a provider develops cost-to-charge ratios by specific

departments, or "cost centers," within the hospital, e.g. the emergency room, the radiology

department, et cetera   The ratio is derived by dividing the total costs, direct and indirect,

allocable to the cost center by the amount of the charges generated by the cost center during

the same time period.  This cost-to-charge ratio allows the provider to apportion costs to

Medicare patients on the Worksheet D series.

43.     Fourth, the provider completes the Worksheet D series of the Hospital Cost

Report.  See pages 6-66 through 6-117 of Exhibit 2.  In order to determine Medicare's share

of the provider's total costs, the Worksheet D series apportions these costs to the Medicare

program on the basis of cost-to-charge ratios and per diem amounts.

44.     For items and services subject to reasonable cost reimbursement, the

Worksheet D series completes the process of determining Medicare reimbursement of such

items and services.  For items and services payable under PPS, the Worksheet D series

determines Medicare's liability for the provider's inpatient costs.

45.     The inpatient liability for acute care hospitals is determined by the interim claims submitted by the provider for particular patient discharges during the course of the fiscal year.  These claims are then summarized on the Provider Statistical and Reimbursement Report and entered on the settlement worksheets as the program liability for inpatient acute care hospital services.

46      After determining Medicare's share of the provider's cost and/or determining Medicare's liability under PPS, the provider brings these costs forward to the Worksheet E series of the Hospital Cost Report.  These costs are then totaled to determine Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year.  The Worksheet E series then subtracts the amount of interim payments made to the provider based upon the payments made on a claim-by-claim basis.  The difference is the amount due the Medicare program or the amount due the provider.

47      Every Hospital Cost Report contains a "Certification," which must be signed by the chief administrator of the provider or a responsible designee of the administrator  See page 6-1 of Exhibit 2

48      Providers who file their Hospital Cost Reports electronically are required to submit a paper certification to the fiscal intermediary, which must be signed and dated.  42 C.F.R. § 413.24(f)(4).

49.     For cost reporting periods prior to approximately 1992, the certification provision in the Hospital Cost Report required the responsible provider official to certify, in

-12-

pertinent part, that

> to the best of my knowledge and belief, it [the Hospital Cost
> Report] is a true, correct and complete statement prepared from
> the books and records of the provider in accordance with
> applicable instructions, except as noted.

Copy of Form HCFA-2552-81 attached hereto as Exhibit 3.

50.     Thus, the provider must certify that the filed cost report is (1) truthful, i.e., that

the cost information contained in the report is true and accurate, (2) correct, i.e., that the

provider is entitled to reimbursement for the reported costs in accordance with applicable

instructions, and (3) complete, i.e., that the Hospital Cost Report is based upon all of the

provider's cost information pertaining to the determination of reasonable cost.  Exhibit 3.

51      As to cost reports for years from 1992 on, the certification provision of the

Hospital Cost Report was revised by Medicare to include in addition to the above, the

following sentence·

> I further certify that I am familiar with the laws and regulations regarding the
> provision of health care services, and that the services identified in this cost
> report were provided in compliance with such laws and regulations.

See page 6-1 of Exhibit 2.

52.     The Medicare program depends heavily upon the truthfulness of providers in

completing their cost reports.  It is common knowledge in the healthcare industry that the

government lacks adequate resources to conduct a full-scope audit of each of the over 35,000

providers nationwide, including hospitals, which file cost reports with Medicare each year.

53      To address this problem HCFA has devised a methodology that subjects all

cost reports to an automated uniform "desk review" process.  Based on the results of the desk

-13-

review, and the funds available for audit, intermediaries select providers for field audits.

54.     In 1997, of 35,709 provider cost reports received from hospitals, skilled nursing facilities (commonly known as nursing homes), home health agencies, and other institutional providers of patient care, just over 5,000 (or approximately 14%) were selected for a field audit.  Because of limited resources, field audits are usually limited to specific issue areas or cost report line items.

55     Defendants took advantage of the Medicare program's limited resources by submitting false claims and false statements in their hospital cost reports with the expectation that they would not be discovered upon audit.

56.     Defendants established reserves for the possibility that the false claims and false statements made in their Medicare cost reports would be caught by their fiscal intermediaries and that the reserve amounts would have to be repaid to Medicare.

57.     HCFA conditions both interim and year-end payments on the truthfulness of the statements contained in the cost report and, as explained herein, relies on this information in determining the provider's payment.  42 C.F.R. § 413.20(e).

58     HCFA considers any cost report containing a false statement that affects reimbursement to be invalid

59     Each of the cost reports prepared and submitted by Quorum on behalf of its owned or managed hospitals, included the following certification:

> to the best of my knowledge and belief, [the cost report] is a <u>true</u>, <u>correct</u>, and <u>complete</u> report prepared from the books and records of

-14-

the provider in accordance with applicable instructions, except as noted.

(Emphasis added).

60     Thus, to comply with the three-pronged certification requirement, a provider hospital must include the required data and information in accordance with applicable instructions.

## VIII.  APPLICABLE INSTRUCTIONS

61.    Medicare requires providers to maintain complete and accurate cost information and to prepare their cost reports based on that information. Because Medicare fiscal intermediaries need to audit a provider's cost information, a provider must make available its complete cost records. The pertinent Medicare regulations provide that:

> (1) The provider must furnish such information to the intermediary as may be necessary to (i) <u>Assure proper payment by the program</u>  . . . ; (ii) Receive program payments, and (iii) Satisfy program overpayment determinations.

42 C.F.R. § 413.20(d) (emphasis added).

> (a) Principle. Providers receiving payment on the basis of reimbursable cost must provide <u>adequate cost data</u>. This must be based on their financial and statistical records which must be capable of verification by qualified auditors.
>
> &ast; &ast; &ast;
>
> (c) Adequacy of cost information. Adequate cost information must be obtained from the provider's records to support payments made for services furnished to beneficiaries. The requirement of adequacy of data implies that the data be accurate and in sufficient detail to accomplish the purposes for

-15-

which it is intended . . . .

42 C.F.R. § 413.24 (emphasis added).

62.    HCFA's Provider Reimbursement Manual ("PRM") contains additional

instructions to providers for the preparation of their cost reports.  It states that

> Providers receiving payment on the basis of reimbursable cost
> must provide adequate cost data based on financial and
> statistical records which can be verified by qualified auditors .   .
> .

PRM § 2300  The PRM further provides that:

> Cost information as developed by the provider must be current,
> accurate, and in sufficient detail to support payments made for
> services rendered to beneficiaries.  This includes all ledgers,
> books, records and original evidences of cost (purchase
> requisitions, purchase orders, vouchers, requisitions for
> materials, inventories, labor time cards, payrolls, bases for
> apportioning costs, etc.), which pertain to the determination of
> reasonable cost, capable of being audited.

PRM § 2304 (emphasis added).  In addition,

> A participating provider of services must make available to its
> intermediary its fiscal and other records for the purpose of
> determining its ongoing recordkeeping capability.  The
> intermediary's examination of such records and documents are
> necessary to ascertain information pertinent to the
> determination of the proper amount of program payments due
> the provider.

PRM § 2304.1.

63.    Thus, under the applicable regulations and instructions, a Medicare cost report

must be based upon all of the provider hospital's cost records, which must then be made

available to Medicare for examination.  42 C.F.R. §§ 413.20(d), 413.24; PRM (Part I)

-16-

§§ 2300, 2304, 2304.1

64      A provider hospital may not conceal or withhold pertinent financial data it

knows, or should know, potentially affects the amount of Medicare reimbursement properly

owing to the hospital.

65.      The applicable instructions contain procedures for a provider to include in a

Hospital Cost Report non-allowable items that the provider believes should be reimbursable

and for which the provider wishes to dispute the determination of non-allowability.  This

procedure allows the provider to file a cost report  under protest as long as the costs protested

are disclosed to the Medicare fiscal intermediary.  The instructions provide:

> You are permitted to dispute regulatory and policy
> interpretations through the appeals process established by the
> Social Security Act.  Include the nonallowable item in the cost
> report in order to establish an appeal issue, and the disputed
> item must pertain to the cost reporting period for which the cost
> report is filed.  Retroactive application of any decision from
> adjudicated issues are governed by §2931.1 of HCFA Pub. 15-I.

PRM (Part II) § 115.

> When you file a cost report under protest, the disputed item and
> amount for each issue must be specifically identified in
> footnotes to the settlement worksheet and the fact that the cost
> report is filed under protest must be disclosed.

PRM (Part II) § 115.1.

> The effect of each nonallowable cost report item is estimated by
> applying reasonable methodology which closely approximates
> the actual effect of the item as if it had been determined through
> the normal cost finding process.  In addition, you must submit,
> with the cost report, copies of the working papers used to
> develop the estimated adjustments in order for the intermediary
> to evaluate the reasonableness of the methodology for purposes

> of establishing whether the cost report is acceptable. The cumulative effect on reimbursement for all disputed issues is shown as an adjustment to balance due to the program (provider) in the reimbursement settlement computation. The actual effect on reimbursable cost(s) is determined after final adjudication of the issue(s).

PRM (Part II) § 115.2.

> If you deliberately include cost, without disclosing the fact, in the provider cost report that is nonreimbursable under the regulations you are subject to those provisions concerning suspected fraud or abuse. Where you fail to comply with the requirements for filing cost reports under protest as set forth above, such cases are referred to the HCFA Regional Office.

PRM (Part II) § 115.3.

66.     Defendants are and were familiar with the Medicare law, regulations, instructions, and the PRM governing the preparation and submission of Medicare cost reports

67.     In addition, if a hospital discovers errors and omissions in its claims submitted for reimbursement to Medicare (including its cost reports), it is required to disclose those matters to its fiscal intermediary. 42 U.S.C. § 1320A-7b(a)(3) creates a duty to disclose known errors in cost reports:

> Whoever . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . be guilty of a felony.

## IX.    FALSE CLAIMS AND FALSE STATEMENTS TO MEDICARE

68    In 1975, QHR's predecessor, HCA Management Company, issued a

reimbursement policy guideline which required that:

> Cost reports should be filed requesting maximum
> reimbursement based on an *aggressive interpretation* of the
> Law, Regulation, and Policy.

(Emphasis added).

69.    The HCA Management Company guideline also required that reserves be

created only for those

> items, sophistications, etc., which upon discovery, examination
> or other future event will "probably" be lost.  No reserves
> should be provided where the possibility of loss is remote.

70    In 1980, HCA Management Company amended its cost report preparation

procedure to require that its managed hospitals disclose to Medicare only those items that

were clearly contrary to Medicare regulations and for which HCA Management Company

wished to protect its hospitals' appeal rights.

71.    Thus, HCA Management Company's policy was to prepare and file an

"aggressive" cost report seeking maximum reimbursement, reserving for those items that

would "probably" be lost upon discovery, and disclosing only those items that were contrary

to clearly expressed program policy for which HCA Management Company wished to protect

its hospitals' appeal rights.

72.    According to a HCA Management Company's November 1986 document,

HCA Management Company followed a policy or practice to prepare a reserve cost report if

"the potential reserve amount exceeds $10,000 for under 100 bed hospitals or $25,000 for over 100 bed hospitals."

73.     QHR continued its predecessor's cost report preparation policies when QHR became a separate company in 1989.  From 1989 through 1995, QHR's policy or practice was to prepare a reserve cost report, reserve cost report workpapers, and a reserve cost report summary for each cost report filed with the fiscal intermediary for its managed hospitals where the potential reserve amounts exceed $10,000 for under 100 bed hospitals or $25,000 for over 100 bed hospitals.

74.     Since QHG first acquired hospitals in 1990, QHG and its subsidiaries which own the hospitals have followed the identical policy or practice of preparing a reserve cost report, reserve cost report workpapers, and a reserve cost report summary for each cost report filed with the fiscal intermediary where the potential reserve amounts exceed $10,000 for under 100 bed hospitals or $25,000 for over 100 bed hospitals.

75.     As established by its predecessor, HCA Management Company, Quorum's policy or practice has been to reserve for those items that would probably be lost upon discovery by the Medicare fiscal intermediary

76      In accordance with its policy or practice, Quorum has disclosed only those reserve items contrary to clearly expressed program policy for which Quorum wished to protect its appeal rights.

77.     Thus, in preparing Medicare cost reports, Quorum's policy has been routinely to conceal from the fiscal intermediaries and HCFA claims for cost reimbursement that

Quorum knew would probably be lost if disclosed.

78.    Cost reports submitted by Quorum-owned hospitals were prepared by Quorum employees. Attached at Exhibit 4, and incorporated herein by reference, is a chart listing Quorum-owned hospitals which identifies in columns M, N, Q, R, S, and T the names and titles of the Quorum employees responsible for preparing and reviewing Quorum-owned hospitals' Medicare cost reports and reserve cost reports. Column O of Exhibit 4 identifies the person who signed the hospital cost report, who was always a Quorum employee. Column P identifies the title of the individual who signed the hospital cost report.

79    Plaintiffs have included in Exhibit 4 information for all years available to them Where the information is missing, it is entirely within defendants' control. Where plaintiffs have incomplete information on Exhibit 4 for the columns described in ¶ 78, that information is entirely within defendants' and/or their client hospitals' control.

80.    Cost reports submitted by hospitals managed by Quorum were prepared by Quorum Health Resources employees from the Health Financing Resources ("HFR") Department with some exceptions where the work was contracted out to consultants whose work was always reviewed by a Quorum employee.

81    Attached at Exhibit 5, and incorporated herein by reference, is a chart listing hospitals managed by HCA Management Company and its successor, QHR, which identifies in columns L, M, P, R, and S the names and titles of the employees responsible for preparing and reviewing the managed hospitals' Medicare cost reports and reserve cost reports. Column Q identifies outside consultants who prepared certain managed hospitals' cost reports and

-21-

reserve cost reports.  Column S identifies the employee responsible for reviewing the outside

consultant's work.  Columns N and O of Exhibit 5 identify the person who signed the hospital

cost report, who was always an employee of HCA Management Company or Quorum, and

that person's job title (usually the hospital administrator or chief financial officer)

82.     Plaintiffs have included in Exhibit 5 information for all years available to them

When the hospital was managed by HCA Management Company and/or QHR for additional

years not reflected in Exhibit 5, the information is entirely within the control of defendants

Where plaintiffs have incomplete information in Exhibit 5 for the columns described in ¶ 81,

that information is entirely within defendants' and/or their client hospitals' control.

83.     As a result of its established policies or practices, Quorum's owned and

managed hospitals have repeatedly falsely certified to the government that its cost reports

were a "complete statement   . . except as noted."

84     Indeed, Quorum's cost reports were <u>incomplete</u> to the extent that they failed to

disclose what Quorum knew, that certain items listed in the corresponding reserve cost report,

workpapers and summary, would be lost if discovered by auditors.

85     Contrary to its certifications, the cost reports filed by Quorum for its owned

and managed hospitals were not "complete" because Quorum failed to include in the filed cost

report adequate cost information regarding reimbursability reflected in the reserve cost

reports.

86.     Quorum took affirmative steps to conceal the financial information contained

in its reserve cost reports, workpapers and summaries by marking and  keeping the reserve

records confidential, i.e., by not giving them to Medicare auditors. Under these circumstances, the certifications by Quorum employees that each of their hospitals' filed cost reports is a "complete statement . . . except as noted," were false.

87.     In addition, Quorum filed Medicare cost reports that it knew contained untruthful or incorrect claims for reimbursement, contrary to its certifications that the filed cost reports were true and correct to the best of its knowledge.

88.     As alleged above, it was the policy or practice of Quorum to maintain a reserve for all cost reimbursement requests that would probably be lost if discovered by Medicare program auditors

89.     Thus, a cost item that Quorum believed would probably be lost if discovered was, necessarily, an "incorrect" item in the filed cost report in the respective firm's opinion.

90.     Under these circumstances, the certification by Quorum that each of its filed cost reports is a "correct . . . statement . . . except as noted," was knowingly false.

91.     Quorum routinely sought Medicare reimbursement for non-allowable costs, and for capital, depreciation, interest, bad debts, and other categories of costs, that were untruthful or incorrect or both, and noted these facts in the reserve set of cost records concealed from Medicare program auditors.

92     In this action, plaintiffs sue QHG and QHR based upon false claims, false certifications, and false statements in cost reports prepared and certified by HCA Management Company employees for managed hospitals from January 1, 1985 through July 1989, and for false claims, false certifications, and false statements in cost reports prepared and certified by

-23-

QHR employees for managed hospitals from July 1989 through December 31, 1995.

93.     Plaintiffs also sue QHG, its subsidiaries that own or owned hospitals, and where still owned by QHG or its subsidiaries those hospitals themselves, based upon false claims, false certifications, and false statements in cost reports submitted and certified by Quorum employees for all cost reports submitted for hospitals owned or formerly owned by subsidiaries of QHG since 1990.

## X.     FALSE CLAIMS AND FALSE STATEMENTS TO MEDICAID

94.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal involvement in Medicaid is largely limited to providing matching funding and ensuring that the states comply with minimum standards in the administration of the program.

95     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation ("FFP").  42 U S C  § 1396, et seq.

96.     Each state's Medicaid program must provide hospital services.  42 U.S C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

97.     Provider hospitals participating in the Medicaid program file annual cost reports with the single state agency administering the particular state's Medicaid program, or its intermediary, in a protocol similar to the one governing the submission of Medicare cost reports.

98.     In some states provider hospitals participating in the Medicaid program file a

-24-

copy of their Medicare cost report with the Medicaid program which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement. In other states provider hospitals file a separate Medicaid cost report.

99. Providers incorporate in these separate Medicaid cost reports the same type of financial data contained in their Medicare cost reports, and include data concerning the number of Medicaid patient days at a given facility.

100 Typically, each state requiring the submission of a Medicaid cost report also requires that an authorized agent of the provider expressly certify that the information and data contained within the submitted cost report is true and correct.

101. This Medicaid patient data is then utilized by individual Medicaid programs to determine the reimbursement to which the facility is entitled, and the facility receives a proportion of its costs equal to the proportion of Medicaid patients in the facility.

102. Where a provider submits the Medicare cost report to Medicaid, false or incorrect data or information contained in the Medicare cost report necessarily causes the submission of false or incorrect data or information to the state Medicaid program.

103 Where a provider submits the Medicare cost report to Medicaid, the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well

104. Where a provider submits a Medicaid cost report that contains the same false or incorrect information contained in the provider's Medicare cost report, false statements and false claims have been made for reimbursement from Medicaid.

105.   Quorum created reserves for amounts that would have to be repaid to Medicaid if the falsely inflated and improper costs were caught by the Medicare or Medicaid program auditors   However, in some cases, Quorum did not create reserves for Medicaid although it created Medicare reserves for costs that were also being claimed for reimbursement from Medicaid.

106.   The United States has been damaged whenever a state Medicaid program has been damaged by defendants' submission of false claims and false statements because the United States funds a portion of each state's Medicaid program as described above at ¶¶ 94-95.

107.   Attached hereto as Exhibit 4, and incorporated herein by reference, is a chart listing Quorum-owned hospitals which identifies in column G Quorum-owned hospitals that, based on the information available in the attached exhibits and known company policy and practice, sought reimbursement from designated state Medicaid programs based on submission of the hospital's Medicare cost report or a separate Medicaid cost report for the time period pertinent to this complaint.

108.   Attached hereto as Exhibit 5, and incorporated herein by reference, is a chart listing Quorum-managed hospitals which identifies in column G Quorum-managed hospitals that, based on the information available in the attached exhibits and known company policy and practice, sought reimbursement from designated state Medicaid programs based on submission of the hospital's Medicare cost report or a separate Medicaid cost report for the time period pertinent to this complaint.

-26-

## XI.   FALSE CLAIMS AND FALSE STATEMENTS TO TRICARE/CHAMPUS

109.   At all times relevant to this complaint many of Quorum's owned and managed hospitals were enrolled in, and sought reimbursement from, the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), now known as TRICARE Management Activity/ CHAMPUS ("TRICARE/CHAMPUS").

110.   TRICARE/CHAMPUS is a federally-funded program that provides medical benefits, including hospital services, to the spouses and unmarried children of active duty and retired service members, to the spouses and unmarried children of reservists who were ordered to active duty for thirty days or longer, and to the unmarried spouses and children of deceased service members and to retirees.  Hospital services at non-military facilities are sometimes provided for active duty members of the armed forces, as well.  10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

111.   TRICARE/CHAMPUS reimburses hospitals for two types of costs that are based on the Medicare cost report: capital costs and direct medical education costs.  32 C.F.R. § 199.6.

112   A facility seeking reimbursement from TRICARE/CHAMPUS for the costs described in ¶ 111 is required to submit a TRICARE/CHAMPUS prescribed form entitled, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement") in which the provider sets forth its number of TRICARE/CHAMPUS patient days and financial information which relate to these two cost areas and which are derived from the Medicare cost report for that facility.  This form is

-27-

attached hereto at Exhibit 6, and incorporated by reference herein.

113.    This Request for Reimbursement requires that the provider expressly certify that the information contained therein is "accurate and based upon the hospital's Medicare cost report." See Exhibit 6.

114.    Upon receipt of a hospital's Request for Reimbursement and the provider's financial data, TRICARE/CHAMPUS or its fiscal intermediary applies a formula for reimbursement wherein the hospital receives a percentage of its capital and medical education costs equal to the percentage of TRICARE/CHAMPUS patients in the facility.

115.    In the event that a Medicare intermediary disallows capital or medical education costs claimed in the provider's cost report after an audit, the provider is required to inform TRICARE/CHAMPUS of the disallowance.

116    Indeed, the Request for Reimbursement requires that the provider expressly certify that the provider will notify CHAMPUS of "any changes which are the result of an audit of the hospital's Medicare cost report" within thirty days of the date the hospital is notified of the change. See Exhibit 6.

117.    TRICARE/CHAMPUS does not receive Medicare audit results directly from Medicare intermediaries but rather relies upon the honesty of the provider in disclosing any and all adjustments made by Medicare or its fiscal intermediaries to the Medicare cost report, so that similar adjustments can be made by TRICARE/CHAMPUS.

118.    Quorum submitted Requests for Reimbursement for its owned and managed hospitals to TRICARE/CHAMPUS that were based on their Medicare cost reports.

-28-

Whenever defendants' Medicare cost reports contained falsely inflated or incorrect data or information from which defendants derived their Requests for Reimbursement submitted to TRICARE/CHAMPUS, those Requests for Reimbursement were also false.

119.   Whenever defendants' Requests for Reimbursement were false due to falsity in their Medicare cost reports, defendants falsely certified that the information contained in their Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report " (emphasis added).

120   Based on the information available in the attached exhibits and known company policy and practice, Quorum knowingly failed to notify TRICARE/CHAMPUS of changes that were the result of audits of its owned and managed hospitals' Medicare cost reports as required when those changes would have decreased the amount of reimbursement the hospitals were entitled to receive from TRICARE/CHAMPUS.

121.   Whenever Quorum did not notify TRICARE/CHAMPUS of changes that were the result of audits of its owned and managed hospitals' Medicare cost reports, the hospitals accepted reimbursement from TRICARE/CHAMPUS of more than they were entitled to receive knowing that they were entitled to lesser sums.

122   While Quorum generally did not create separate reserves for TRICARE/CHAMPUS, Quorum knew that false claims contained in its owned and managed hospitals' Medicare cost reports often would affect TRICARE/CHAMPUS reimbursement as well

123   Attached hereto as Exhibit 7, and incorporated herein by reference, is a chart listing Quorum-owned hospitals which identifies the hospitals that sought reimbursement from

-29-

TRICARE/CHAMPUS by submitting the Request for Reimbursement for the time period pertinent to this complaint

124    Attached hereto as Exhibit 8, and incorporated herein by reference, is a chart that identifies the hospitals managed by HCA Management Company and QHR that sought reimbursement from TRICARE/CHAMPUS by submitting the Request for Reimbursement for CHAMPUS for the time period pertinent to this complaint.

## XII.    IDENTIFICATION OF HOSPITALS, PERSONNEL, AND DATES

125.    Attached hereto at Exhibit 4, and incorporated by reference herein, is a chart of hospitals owned by Quorum, which lists at Column A the hospital name, in Columns B and C, the city and state in which the hospital is located, in Column D the cost report year end date, in Column E the hospital's Medicare Provider number, in Column F the hospital's Medicare fiscal intermediary, in Column G whether or not a copy of the Medicare cost report was filed with the state Medicaid program seeking Medicaid reimbursement, at Column H, the hospital's Medicaid provider number, in Column I the date on or about which the cost report was filed with the hospital's Medicare fiscal intermediary, in Column J the date on or about which the amended Medicare cost report (if any) was filed with the hospital's Medicare fiscal intermediary, in Column K the date on or about which the reserve cost report was prepared, in Column L whether reserve workpapers have been produced to the United States to date, in Column M the person at the hospital responsible for assisting in preparing the cost report, in Column N the title of the person at the hospital responsible for assisting in preparing the cost report, in Column O, the person who signed the cost report, in Column P, the title of the

-30-

person who signed the cost report, in Column Q, the names of other Quorum personnel responsible for the cost report and reserve cost report preparation, in column R the titles of the person(s) in Column Q, and in Column S, the name(s) of any other Quorum personnel who reviewed the cost report and reserve cost report, in Column T the titles of the person(s) in Column S, and in Column U the names of any outside consultants who assisted Quorum in preparing the cost report. Where Columns K through N and Q through U are blank, the information is entirely within defendants' control.

126.     Attached hereto at Exhibit 5, and incorporated by reference herein, is a chart of hospitals managed by HCA Management Company and QHR which lists at Column A the hospital name, in Columns B and C, the city and state in which the hospital is located, in Column D the cost report year end date, in Column E the hospital's Medicare Provider number, in Column F the hospital's Medicare fiscal intermediary, in Column G whether or not a copy of the Medicare cost report was filed with the state Medicaid program seeking Medicaid reimbursement, at Column H, the hospital's Medicaid provider number, in Column I the date on or about which the cost report was filed with the hospital's Medicare fiscal intermediary, in Column J the date on or about which the reserve cost report was prepared, in Column K whether reserve workpapers have been produced to the United States to date, in Column L the person at the hospital responsible for assisting in preparing the cost report, in Column M the title of the person at the hospital responsible for assisting in preparing the cost report, in Column N, the person who signed the cost report, in Column O, the title of the person who signed the cost report, in Column P, the person responsible for the cost report

and reserve cost report preparation, in Column Q the name of any outside consultant who prepared the cost report, in Column R the name of the person who assisted in preparing the cost report (if any), in Column S, the person who reviewed the cost report and reserve cost report. Where Columns J through M and P through S are blank, the information is entirely within defendants' control.

127.    As alleged herein, all Quorum defendants engaged in a concerted effort and scheme to maximize reimbursement from various government health care programs, including Medicare, Medicaid and TRICARE/CHAMPUS.

128.    These efforts involved the submission to these programs of costs allegedly associated with the care rendered on behalf of their beneficiaries, which they knew were not reimbursable under the rules and regulations governing those programs.

129     These submitted costs constitute false claims under the False Claims Act to the extent the defendants knew (as defined in the False Claims Act) they were not reimbursable under the rules and regulations governing those programs.

130.    In ¶¶ 132-310 below, plaintiffs detail the major types of false claims and false statements contained within the cost reports prepared and submitted by defendants for their owned and managed hospitals.

131.    The examples that follow in ¶¶ 132-316 below are not, by far, an exhaustive list of the false statements and claims allegedly submitted by the defendants. Defendants' false claims are too numerous to catalogue exhaustively in the text of this complaint while remaining in compliance with Fed. R. Civ. P. 8(a). Rather they illustrate the efforts at

concealment used by the defendants and the major types of costs submitted for reimbursement with knowledge that they were false.  Many more examples typifying the claims included in (and excluded from) this action are identified in Exhibits 32-196 of this complaint, which are incorporated herein and which are further explained in ¶¶ 311-313 below.

## XIII.   NON-ALLOWABLE COSTS

132    Defendants knowingly made and/or caused to be made various false claims and false statements in cost reports seeking reimbursement from the Medicare and Medicaid Programs for non-allowable costs.

133.    Defendants repeatedly ignored the regulations and claimed costs that were specifically not allowed.  As part of defendants' policies and practices, they created "reserves" for non-allowable costs which defendants knew "would probably be lost upon discovery" by a fiscal intermediary.

134.    In knowing disregard of the regulations, defendants often claimed costs not related to patient care in their Medicare cost reports.

135.    These costs included costs which were not appropriate or necessary and proper in developing and maintaining the operation of patient care facilities and activities.

136    Costs that are not necessary include costs that usually are not common or accepted occurrences in the field of the provider's activity.  PRM § 2103.3

137.    In furtherance of the above fraudulent scheme, Quorum knowingly  made each of the following types of false claims that claimed reimbursement for non-allowable costs, among others.

## A.   **Personal Comfort Items**

138   Medicare will not reimburse a provider for the costs of providing items or services to patients solely for the personal comfort of the patients.

139.   The full costs of items or services such as telephone, television, and radio that are located in patient accommodations are not includable in allowable costs of providers under the Medicare Program.  PRM § 2106.1

140.   Based on the information available in the attached exhibits and known company policy and practice, defendants violated the rules described in ¶¶ 132-139.

141.   For example, in a cost report prepared by defendant QHR for Jupiter Medical Center, for the cost year ending September 30, 1992, and submitted by Jupiter to Medicare, the hospital claimed reimbursement for costs for a telephone lease

142.   Plaintiffs allege on information and belief that QHR caused Jupiter Medical Center to submit a cost report claiming non-allowable telephone lease costs that QHR knew were non-allowable costs and that QHR contemporaneously created a specific "reserve" in the event the intermediary discovered the overcharge and made an adjustment.

143.   Defendant QHR's "reserve" cost report for Jupiter for 1992  included a reserve amount of $25,860 for the telephone lease.  See reserve attached hereto as Exhibit 9, and incorporated herein by reference.

144   As a result of the misrepresentations alleged in ¶¶ 141-143, Medicare was induced to pay to Jupiter Medical Center an amount of $25,860 which it otherwise would not have paid but for the false representation of QHR and its agents.

-34-

## B.    Advertising Costs

145.   Medicare reimburses advertising costs when such costs are reasonable, common and accepted occurrences in the field of the provider's activity and related to patient care   PRM § 2136.

146    Advertising costs incurred in connection with the provider's public relations activities are allowable if the advertising is primarily concerned with the presentation of a good public image and directly or indirectly related to patient care.  PRM § 2136.1.

147.   Advertising costs incurred for the purpose of recruiting medical, paramedical, administrative and clerical personnel are allowable if the personnel would be involved in patient care activities or in the development and maintenance of the facility. PRM § 2136 1

148.   Medicare will not reimburse advertising costs to promote and increase patient utilization of services not properly related to the care of patients.  PRM § 2136.2.

149.   Based on the information available in the attached exhibits and known company policy and practice, defendants violated the rules described in ¶¶ 132-137 and 145-148

150    As an example, in a cost report prepared by QHR for Jupiter Medical Center, for the cost year ending September 30, 1992, and submitted by Jupiter to Medicare, the hospital claimed reimbursement for costs for public relations.

151.   Plaintiffs allege on information and belief that QHR caused Jupiter Medical Center to submit a cost report claiming non-allowable public relations costs that QHR knew were non-allowable costs and that QHR contemporaneously created a specific "reserve" in the

amount of $15,641 in the event the intermediary discovered the overcharge and made an adjustment. See reserve attached hereto as Exhibit 10, and incorporated herein by reference

152.   As a result of the misrepresentations alleged in ¶¶ 150-151, Medicare was induced to pay to Jupiter Medical Center an amount of $15,641 which it otherwise would not have paid but for the false representation of QHR and its agents.

### C.   Non-allowable Meals

153.   Medicare will reimburse providers for the costs of all meals that are provided to patients receiving care from a provider. Medicare also will reimburse a portion of the cost of meals (that part that represents unrecovered costs of the provider) provided to staff as a fringe benefit related to patient care.

154   However, Medicare will not reimburse providers for cost of meals not related to patient care, for example, the cost of meals provided to guests of patients or to visitors to the provider. PRM §§ 2105.2, 2145.

155.   Based on the information available in the attached exhibits and known company policy and practice, defendants violated the rules described in ¶¶ 132-137 and 153-154

156.   For example, for the cost report year ending December 31, 1991, QHR prepared a cost report for Brazosport Memorial Hospital which the hospital submitted to Medicare for reimbursement that contained an adjustment of $134,116 to offset cafeteria revenues from guests and employees from the cafeteria cost center.

157.   QHR consultant John Thompson prepared a "reserve" cost report for

-36-

Brazosport for 1991 which included a reserve that increased the adjustment for amount of cafeteria revenues to $194,371, and which computes to a $60,255 difference. See reserve attached hereto as Exhibit 11, and incorporated herein by reference.

158    Plaintiffs allege on information and belief that QHR caused Brazosport Memorial Hospital to submit a cost report for 1991 claiming non-allowable meal costs that QHR knew were non-allowable and contemporaneously created a specific "reserve" in the event the intermediary discovered the overcharge and made an adjustment.

159.    As a result of the misrepresentation alleged in ¶¶ 156-158, Medicare was induced to pay Brazosport an amount which it otherwise would not have paid but for the false representation of QHR and its agents.

**D.    Physician Billing**

160.    Medicare will not reimburse providers for costs associated with billing services to provider-based physicians for direct medical and surgical services rendered to individual patients  The only exception occurs when billing for direct medical and surgical services is incurred on behalf of compensated provider-based physicians for services rendered before January 1, 1992 and where payment for the services is made to the provider by the carrier on a compensation related customary charge basis.  PRM § 2110.4.

161.    A provider that incurs non-allowable physician billing costs must identify the costs as such and offset the costs against its total direct and indirect billing costs  PRM § 2110.4.

162.    Based on the information available in the attached exhibits and known

company policy and practice, defendants violated the rules described in ¶ 132-137 and 160-161

163.    For example, in a cost report prepared by QHR for Jupiter Medical Center, for the cost year ending September 30, 1992, and submitted by the hospital to Medicare on or about January 18, 1993, the hospital claimed reimbursement for costs for Emergency Room ("ER") physician billing.

164    Plaintiffs allege on information and belief that QHR caused Jupiter Medical Center to submit a cost report claiming non-allowable ER physician billing expenses that QHR knew were non-allowable costs.

165    The "reserve" cost report for Jupiter for 1992 prepared by QHR on or about January 29, 1993 included a reserve of $9,450 for non-allowable ER physician billing. See attached hereto as Exhibit 12, and incorporated herein by reference.

166.    As a result of the misrepresentation alleged in ¶¶ 163-165, Medicare was induced to pay to Jupiter Medical Center an amount of $9,450 which it otherwise would not have paid but for the false representation of QHR and its agents.

   **E.    Legal Fees**

167    Medicare will not reimburse legal fees and related costs incurred by a provider unless they are related to the provider's furnishing of patient care.  PRM §2183

168.    Based on the information available in the attached exhibits and known company policy and practice, defendants violated the rules described in ¶¶ 132-137 and 167

169.    As an example, in a cost report prepared by QHR for Dallas/Ft. Worth Medical

-38-

Center for the cost year ending October 31, 1989, and submitted by the hospital to Medicare, the hospital claimed reimbursement for 100% of its legal fee expenses.

170.   QHR created a "reserve" cost report for Dallas/Fort Worth that set up a legal fee expense account as 100% non-allowable expenses.

171    Plaintiffs allege on information and belief that QHR knew that at least a portion of the legal fees were non-allowable and caused Dallas/Ft Worth Medical Center to submit a cost report claiming non-allowable legal fee expenses.

172.   In furtherance of defendants' scheme to cover up their attempt to increase reimbursement from the government, QHR stamped the Dallas/Fort Worth Medical Center reserve cost report for 1989 **"CONFIDENTIAL. Do Not Discuss or Release to Medicare Auditors."** See reserve attached hereto as Exhibit 13, and incorporated herein by reference.

## XIV.   CAPITAL RELATED COSTS

173    Medicare will pay a share of certain capital-related costs.  HCFA has adopted specific policies to determine whether a cost is reimbursable as a capital expense

174    Medicare regulations define allowable capital costs to include net depreciation expense adjusted by gains and losses from the disposal of depreciable assets; taxes on land and depreciable assets; certain lease and rental payments; the costs of betterments and improvements; the costs of certain minor equipment; insurance expense on depreciable assets, net interest expense where related to capital assets; in limited circumstances return on equity capital; reasonable capital costs of related organizations; and debt-related costs where the debt was used to acquire capital assets. 42 C.F.R. § 413.130(a); PRM § 2806.1.

175    Specifically excluded from capital costs are, among other things, costs of various forms for repair and maintenance, certain types of interest, insurance, and taxes, costs of certain pieces of minor equipment, and cleaning services, guard services, and utilities PRM § 2806.2.

176.    To qualify as a capital-related cost a cost must not only meet the statutory and regulatory definitions but must also be supported by proper documentation demonstrating that the cost is in fact capital related.  In addition, a capital-related cost must be verifiable by the hospital's fiscal intermediary  42 C.F.R §§ 413.20(a); 413.24.

177    Capital-related costs are strictly defined for a number of reasons   Among others, during much of the period covered by this complaint reimbursement for capital-related costs was not subjected to "PPS" reimbursement.

178.    Prior to 1991 capital-related costs were directly reimbursed.  Beginning with cost reporting periods beginning on or after October 1, 1991, Medicare began a transition toward PPS for capital costs.  During the transition period capital costs are paid based on complicated formulae that depend to some extent on the provider's actual costs.  The transition will be complete with cost reporting periods beginning on or after October 1, 2001, at which time capital cost reimbursement will be based solely on a national rate. 42 C.F.R. § 412.304; PRM §§ 2807-2807.6.

179    Operating (working capital) costs for inpatient care have been reimbursed through PPS since cost report periods beginning on or after October 1, 1983.

180.    During the period relevant to this complaint, it will almost always be to the

-40-

financial advantage of a provider to characterize a particular expense as a capital-related cost rather than an operating cost

181.    Defendants knowingly violated the rules governing what should be considered a capital cost in the cost reports they prepared and submitted to Medicare, which is evidenced by entries in the reserves that they prepared.

182.    As an example, QHR prepared a cost report for Hardin Memorial Hospital for the cost year ending June 30, 1992, which the hospital submitted to Medicare. In the cost report, QHR inappropriately claimed operating room, maintenance, and central supply costs as capital related equipment costs when they were not equipment costs. Plaintiffs allege on information and belief that these costs were not capital related.

183.    In fact, on a so-called "reserve workpaper" prepared on or about October 20, 1992 by QHR, QHR recognized that these items were improperly submitted to Medicare and reserved $20,646 to pay Medicare in the event this improper submission on Hardin Memorial's 1992 cost report was detected. This reserve workpaper is attached as Exhibit 14 and is incorporated by reference herein.

184.    Most leases count as capital related rather than as operating expenses. Even if a lease is appropriately viewed to be capital-related, however, identified maintenance costs for such equipment are not. If the lease payments include segregated maintenance costs, the provider must not bill Medicare for those costs. 42 C.F.R. § 413.130(b); PRM §§ 2806.1(C), 2806.2. Based on the information available in the attached exhibits and known company policy and practice, defendants routinely mischaracterized items as capital-related leases and

included maintenance costs in their capital-related leases.

185.    In cost reports prepared by defendant QHR for the Dallas/Fort Worth Medical Center for the cost years ending October 31, 1989 and October 31, 1990, the hospital sought reimbursement from Medicare for the full cost of "EDP leases" as capital related.  Plaintiffs allege on information and belief that the leases includes identified maintenance costs.

186.    Indeed, in so-called reserve workpapers prepared by QHR for Dallas/Fort Worth Medical Center, QHR recognized that these amounts were improperly submitted to Medicare and reserved funds to pay Medicare in the event these improper submissions were detected.

187.    The reserve workpaper for the cost year ending October 31, 1989 states that "[i]n the P/Y [prior year], a reserve provision was established for the audit disallowance of maintenance portion of EDP leases."  This workpaper is stamped **"CONFIDENTIAL.  Do Not Discuss or Release to Medicare Auditors."**  It is attached as Exhibit 15 and is incorporated by reference herein.

188    The reserve workpaper for Dallas/Fort Worth Medical Center for the cost year ending October 31, 1990, is stamped **"CONFIDENTIAL.  Do Not Discuss or Release to Medicare Auditors."**  This workpaper also reserves for these maintenance costs, stating that "[i]n prior years, a provision has been made for reserve reporting for disallowance of the maintenance portion of EDP leases." It is attached as Exhibit 16 and is incorporated by reference herein.

189.    HCFA regulations implemented in conjunction with the transition to PPS

differentiate between "new" capital and "old" capital based on whether the assets involved were put into use prior to December 31, 1990. Providers' reimbursement differs based on how a capital-related cost is classified. 42 C.F.R. § 412.302; PRM § 2807.3.

190.     Based on the information available in the attached exhibits and known company policy and practice, defendants knowingly manipulated the classification of capital costs as old or new inappropriately, to increase their reimbursement.

191.     For example, on or about February 16, 1993, QHR prepared a cost report for Dallas/Fort Worth Medical Center for the cost year ending October 31, 1992, which the hospital submitted to Medicare. The cost report allocated certain costs to "New Capital Costs — Movable Equipment" and "Old Capital Costs — Moveable Equipment." Plaintiffs allege on information and belief that these classifications were knowingly false.

192.     On a "reserve" cost report prepared on February 5, 1993, prior to the filed cost report, the amounts allocated to old and new capital costs were changed. .Had the provider submitted the figures in its reserve cost report, it would have received $6,938 less from Medicare than it did by submitting the false allocations. The workpaper on which QHR adjusted these figures is attached as Exhibit 17 and is incorporated by reference herein.

**A.     Depreciation**

193.     The costs of capital assets are reimbursed during the years in which the assets are used, rather than in a lump sum at the time such assets are purchased.

194     The amount of costs attributable to the portion of an assets cost that is consumed during a particular accounting period constitutes the annual depreciation cost of

that asset.

195.    Medicare regulations prescribe which assets are subject to depreciation. Generally, buildings, building equipment, major movable equipment, land improvements and leasehold improvements constitute depreciable assets.  Nonetheless, land improvements, e.g., roads and sewers, are depreciable only if the provider, rather than a governmental entity, is responsible for replacing them.  PRM § 104.7.  In addition, there are other costs associated with land improvements that are not depreciable.  PRM § 104.6.

196.    The method of depreciation permitted generally is the straight line method, under which the cost of an asset is amortized in equal amounts in each year of the asset's useful life.  Nonetheless, other methods of depreciation, including the accelerated and declining balance methods, are allowed under certain circumstances.  42 C.F.R. § 413.134(a)(ii) and (iii); PRM § 116.

197.    The estimated useful life of an asset is defined in the regulations as its "normal operating or service life to the provider."

198.    Providers ordinarily must use the American Hospital Association's Useful Life Guidelines, although these can be overridden by specific useful life guidelines issued by HCFA, if any   The Internal Revenue Service Guidelines may be used for assets acquired before 1981

199.    Even though a useful life is different from that specified in the above-referenced guidelines may be approved by a fiscal intermediary, any significant departure from published guidelines must be based on convincing reasons generally describing the realization

of some unexpected event.

200.    In order for depreciation to be allowed, it must be (a) identifiable and recorded in the provider's accounting records; (b) based on the historical cost of the asset; and (c) prorated over the estimated useful life of the asset using an allowable method of depreciation.

201.    Based on the information available in the attached exhibits and known company policy and practice, defendants regularly calculated depreciation expenses based on a formula that assigned shorter lives to assets than those specified in AHA guidelines, resulting in claims to Medicare for inflated depreciation costs.

202.    Reserve workpapers reveal that defendants often effectively kept two depreciation schedules, one for the as-filed Medicare cost report using incorrect shorter lives, and one for purposes of the reserve report using the appropriate lives as required by AHA guidelines.  Defendants' reserve analyses then calculated the reimbursement differential between the two schedules and reserved that amount so that payment could be made in the event Medicare discovered this deception.

203     HCFA regulation requires that providers maintain sufficient financial records and statistical data for proper determination of costs payable under the program.  42 C.F.R. § 413.9.  Based on the information available in the attached exhibits and known company policy and practice, defendants utilized depreciation costs without supporting the estimated useful life of the assets with documentation.

204.    For example,  Flowers Hospital, a Quorum-owned hospital, used different useful lives in claiming depreciation costs on its June 30, 1993 Medicare cost report than the

approved useful lives.

205.   Plaintiffs allege, upon information and belief, that Quorum knew that Flowers Hospital used unapproved and incorrect useful lives for making claims for depreciation in its 1993 cost report.

206.   On or about March 31, 1995 Quorum employee Edwin J. Warren wrote a file memorandum documenting the $2,109,643 in excess Medicare reimbursement received by Flowers Hospital on its 1993 cost report which noted that when recording the fiscal year 1993 settlement of the cost report, Quorum established a reserve for $2,109,643 for the additional reimbursement received from Medicare for depreciation based on the hospital's claiming different useful lives than appropriate.  See Memo to File attached hereto as Exhibit 18, and incorporated by reference herein.

207.   Mr. Warren's Memo to File regarding Flowers Hospital's 1993 cost report also states:

> [H]istorically the intermediary has used 3-4 individuals for 3 weeks to audit the Medicare cost report for Flowers Hospital.  A three-week audit for the FY 94 cost report was scheduled to begin on January 5, 1995.  We were notified on January 5, 1995, the audit would be postponed until a later date and would be limited in scope.  We were informed one auditor would visit for one week between October, 1995 and March, 1996. . .  [I]t is apparent the intermediary will not revisit the useful lives issue from the FY 93 audit.  Therefore, we will release the FY 93 reserve pertaining to Medicare depreciation.

Exhibit 18

208.   The statements quoted in ¶ 207 above illustrate that defendants took advantage of the lowered Medicare funding for audits to make false claims in their hospital cost reports with the expectation that they would be paid on those claims.

209.   Plaintiffs allege that but for the misrepresentations of Quorum and Flowers Hospital described in ¶¶ 204-208, Medicare was induced to pay Flowers Hospital for its 1993 cost report $2,109,643 in Medicare reimbursement that it otherwise would not have paid.

**B.   Interest Expenses**

210.   Medicare permits reimbursement for a provider's interest expenses that are "necessary" and "proper" for the operations of the provider.  42 C.F.R. § 413.153(a)(1)

211.   "Necessary," as defined in the regulation, requires that a  provider's  interest expenses arise from a loan made to satisfy the provider's financial need <u>and</u> for purposes reasonably related to patient care. 42 C.F.R. § 413.153(b)(2); PRM § 202.2.

212.   "Proper," as defined in the regulation,  requires that the interest paid by the provider be incurred at a rate not in excess of what a prudent borrower would have paid, to an unrelated lender  42 C.F R. § 413.153(b)(3)(i), (ii).

213.   Defendants violated the rules described in ¶¶ 210-212.

214   As an example, in a cost report prepared on or before October 20, 1992 by defendant QHR for Hardin Memorial Hospital for the cost year ending June 30, 1992, the hospital sought reimbursement from Medicare for  interest expenses in the amount of $131,871 which were allegedly incurred from financing the hospital's purchase of an MRI machine and a CT Scanner.

215.   Plaintiffs allege on information and belief that Hardin Memorial Hospital did not finance these purchases, and hence incurred <u>no</u> reimbursable interest expenses in relation thereto, but rather funded the purchases through a depreciation account set aside by the

-47-

hospital to make purchases of such fixed assets.

216.    Indeed, in a so-called "reserve workpaper" prepared by QHR for Hardin Memorial on or about October 20, 1992, QHR recognized that this amount was improperly submitted to Medicare and reserved an amount of $131,871 to pay Medicare in the event this improper submission was detected.  A notation reading "unnecessary borrowing" was placed next to the journal entry recording this reserve by the QHR consultant who prepared the reserve workpaper.  See reserve workpaper attached hereto as Exhibit 19 and incorporated by reference herein

217.    As a result of the misrepresentation alleged in ¶¶ 214-216, Medicare was induced to pay Hardin Memorial Hospital an amount of $131,871 which it otherwise would not have paid but for the false representation of QHR and its agents.

218.    Before submitting annual interest expenses to Medicare, a provider generally is required to "offset" that amount by the amount of investment income earned for that year 42 C.F.R. § 413.153(b)(2)(iii).

219    This investment income for offset is defined as the aggregate net amount realized from all investments of patient care funds in non-patient care related activities and may include interest, dividends, operating profits and losses, and gains and losses on sale or disposition of investments  42 C.F.R. § 413.153(b)(2)(iii); PRM § 202.2C.

220.    Based on the information available in the attached exhibits and known company policy and practice, defendants violated the rules described in ¶¶ 218-219.

221.    As an example, on or about December 28, 1990, defendant QHR prepared a

-48-

cost report for Quincy Hospital which the hospital submitted to Medicare and in which QHR failed to offset such investment income in the amount of $42,240 against interest expenses

222.    Internal documents of defendant QHR estimated that the amount of $16,278 (representing the reimbursement impact of the overstatement referenced in ¶ 221) should be set aside to reimburse Medicare if Medicare auditors caught this misrepresentation and made the appropriate adjustment.  See reserve workpaper attached hereto as Exhibit 20 and incorporated by reference herein.

223.    As a result of the misrepresentation alleged in ¶¶ 221-222, Medicare was induced to pay Quincy Hospital an amount of $16,278 that it otherwise would not have paid but for the false representation of QHR and its agents.

224.    As another example, also in the 1990 cost report that QHR prepared for Quincy Hospital, there is a claim for interest expenses of $3,861,222.

225.    On a so-called "reserve workpaper" prepared on or about December 27, 1990 — the day before the cost report was submitted — QHR recognized that the correct amount of interest expenses that should have been submitted to Medicare by Quincy in its 1990 cost report was $3,611,222 — $250,000 less than what Quincy claimed.  An amount of $96,858 was reserved in the event this improper submission was detected.  See reserve workpaper attached hereto as Exhibit 21 and incorporated by reference herein.

226.    As a result of the misrepresentations alleged in ¶¶ 224-225, Medicare was induced to pay Quincy Hospital an amount of $96,858 which it otherwise would not have paid but for the false representation of QHR and its agents.

## XV.   HOSPITAL-BASED PHYSICIAN HOURS

227.   Providers may claim costs for administrative duties performed by physicians. Providers also are permitted to claim costs for physician time spent teaching, researching, serving on hospital committees, and supervising professional or other personnel.  Adequate documentation must be maintained by the provider to support the total hours for such services.  42 C.F.R. § 415.60; PRM § 2108

228   Defendants often falsely claimed reimbursement for administrative hours of their physicians without having the necessary supporting documentation to attribute hours of physician time to administrative functions.

229.   Defendants' reserve analyses typically indicate that defendants possessed no support for such claims and the amounts claimed were reserved.

230.   As an example, in a cost report prepared on or about September 11, 1991 by Quorum for Parkview Regional Medical Center, a Quorum-owned hospital, which the hospital submitted to Medicare on or about September 17, 1991, Parkview claimed physician fees paid to its Emergency Room physicians and its Medical Directors for administrative expenses.

231   On a workpaper entitled, "Parkview Reserve Processing 6-30-91," prepared by Quorum employee Brenda Qualls, defendants recognized that Parkview's 1991 cost report was improperly submitted to Medicare in that it claimed physician fees for administrative services that were unsupported by the necessary documentation.

232.   The workpaper reads, in pertinent part, "Phys fees — offset all ER fees, and Med director fees since no time records to support".  See reserve workpaper attached hereto

-50-

as Exhibit 22 and incorporated by reference herein.

233.    Parkview's fiscal intermediary, Blue Cross and Blue Shield of Mississippi ("BCBS/MS"), reviewed the 1991 cost report through a desk audit without conducting field work at the hospital

234.    As a result of the desk audit, BCBS/MS adjusted the amounts claimed as paid to the hospital-based physicians downward to the Reasonable Compensation Equivalents ("RCE") published limits contained in 42 C.F.R. § 405.484 and PRM § 2182.6 instead of allowing the full amounts claimed.  This adjustment could be made without review of underlying physician time records.

235.    Upon information and belief, because BCBS/MS could not field audit every hospital's cost report, BCBS/MS did not discover that Parkview's claims for reimbursement for ER physician fees and medical director fees were wholly unsupported and therefore did not learn that they should have been totally disallowed.

## XVI.  SHIFTING INPATIENT COSTS TO OUTPATIENT COSTS

236.    Certain defined services delivered by inpatient hospitals are covered under Part B of the Medicare program, supplementary medical insurance, which typically covers only outpatient services. Part A typically covers only inpatient services.

237.    Part B reimburses according to a published fee schedule that often exceeds the reimbursement available under the PPS system for inpatient Part A reimbursement.

238.    If costs of inpatient services are reimbursed under Part B, they must be removed from the Part A section of a provider's cost report submitted to Medicare  In other

words, the provider may not "double-bill" Medicare for such services. 42 U.S.C. § 1395j-1395w-4, 42 C.F.R. §§ 410, 416; PRM § 2104.1.

239.    Accordingly, a provider can receive increased reimbursement from Medicare by misrepresenting the nature of the service rendered and thereby improperly shifting its Part A costs to the Part B portion of its cost reports.

240.    For example, if a patient is treated in a hospital emergency room for less than 24 hours, this is considered an outpatient service, and the provider is permitted to bill under Part B  Conversely, if a patient is in the hospital for over 24 hours, Medicare assumes the patient is being treated on an inpatient basis and requires the hospital to bill under Part A. Hospitals are required to maintain logs evidencing the length of patient stays.

241.    Based on the information available in the attached exhibits and known company policy and practice, defendants often knowingly and improperly transferred costs from the Part A inpatient area of the cost report to the Part B outpatient area, thereby increasing their reimbursement from Medicare — reimbursement to which they were not entitled

242.    As an example, in a cost report prepared by QHR for Jupiter Medical Center for the cost year ending September 30, 1992, which Jupiter submitted  to Medicare,  QHR improperly represented that Jupiter had incurred $1,081,792 in Part B costs arising from its Emergency Room cost center.

243.    On so-called "reserve workpapers" prepared on January 29, 1993, QHR recognized that this amount was improperly submitted to Medicare and was overstated by the

amount of $718,117, resulting in a claim for reimbursement of $405,022 to which Jupiter Medical Center was not entitled.  These reserve workpapers reveal that the $718,117 for Emergency Room Observation charges were properly allocable to Part A.  The hospital maintained the appropriate logs and records apprising it of the correct allocation of these costs.  Nevertheless, QHR chose to overstate the hospital's Part B costs in an effort to maximize reimbursement.  See reserve workpapers attached hereto as Exhibit 23 and incorporated by reference herein.

## XVII.  HOSPITAL-BASED SUBPROVIDERS

244.   Many of the hospitals owned by Quorum and many of the hospitals managed by QHR own and operate cost-based subproviders such as home health agencies ("HHAs").

245   During the time period relevant to this complaint, HHAs have been reimbursed through the hospital cost report on the basis of the cost of operating the HHA, up to a pre-established limit.  42 U.S.C. § 1395yy; 42 C.F.R. §§ 413.30, 413.314(d); PRM § 2530 et seq This differs from hospital inpatient reimbursement, which is subject to fixed rate PPS reimbursement as explained in ¶ 22.

246.   Accordingly, it is to a provider's advantage to misrepresent hospital inpatient costs as costs associated with the operation of its HHAs or other cost-based subproviders.

247.   Based on the information available in the attached exhibits and known company policy and practice, defendants' owned and managed hospitals with HHAs or other cost-based subproviders engaged in a pattern of conduct in which they misrepresented hospital costs on their cost reports as HHA costs or costs of other cost-based subproviders,

-53-

thereby causing costs allocated to HHAs and other cost-based subproviders to be improperly increased.

248.   As an example, in a cost report prepared by QHR for Monroe County Hospital for the cost year ending February 28, 1992, and submitted to Medicare shortly thereafter, the hospital claimed reimbursement for a portion of the salaries of its Administrator and Controller as direct costs of its owned home health agency, in the amount of $14, 588.

249   In fact, these administrative costs were also included in the hospital portion of the cost report and were included in the reimbursement received by the hospital through the "step-down" of overhead (indirect) costs of the hospital to all hospital cost centers, including the HHA. Hence, allocation of these same costs directly to the home health agency resulted in a double allocation and reimbursement to Monroe County Hospital to which it was not entitled.

250.   On a so-called "reserve workpaper" prepared by  QHR on May 28, 1992, QHR recognized that this amount was improperly submitted to Medicare and  reserved  in the amount of $12,558   See reserve workpapers attached hereto as Exhibit 24 and incorporated by reference herein.

251   As a result of the misrepresentations alleged in ¶¶ 248-250, Medicare was induced to pay Monroe County Hospital an amount of $12,558 which it otherwise would not have paid but for the false representation of QHR and its agents.

## XVIII.  BAD DEBTS

252.   Medicare beneficiaries are routinely required to pay deductibles and

coinsurance amounts   Under certain circumstances Medicare will reimburse providers for these deductibles and coinsurance payments if they prove to be uncollectible from the beneficiary.  42 C.F.R. § 413.80; PRM, Ch. III.

253.   These bad debts are not routinely reimbursable by Medicare as part of a provider's "allowable costs."  PRM § 304.  They are, and remain, the responsibility of beneficiaries.  Medicare, however, will reimburse providers for these if they prove to be unrecoverable in order to avoid those costs being borne by non-Medicare patients.  42 C.F.R § 413.80(d), PRM  § 304

254   Providers may bill Medicare for only certain types of bad debts.  In order to be an allowable charge, "(1) [t]he debt must be related to covered services and derived from deductible and coinsurance amounts[;] (2) [t]he provider must be able to establish that reasonable collection efforts were made[;] (3) [t]he debt was actually uncollectible when claimed as worthless[; and] (4) [s]ound business judgment established that there was no likelihood of recovery at any time in the future." 42 C.F.R. § 413.80(e); PRM § 308.

255.   Providers may bill Medicare only for bad debts attributable to patients covered by Medicare, and only for services that are covered by Medicare. See PRM § 306.

256.   Among other restrictions, providers may not bill Medicare for the professional services  of a provider-based physician if the provider is unable to collect such charges from the beneficiary.  PRM § 324.

257   Based on the information available in the attached exhibits and known company policy and practice, defendants knowingly violated these rules in the cost reports

they prepared and submitted to Medicare, which is evidenced by entries in the reserves that they prepared.

258.   As an example, in a cost report prepared by defendant QHR for Dallas/Fort Worth Medical Center for the year ending October 31, 1989, the hospital sought reimbursement from Medicare for $47,274 in bad debts

259.   Plaintiffs allege on information and belief that the claimed bad debts described in ¶ 258 included professional fees, which QHR knew were not reimbursable by Medicare

260.   Indeed, in a so-called reserve workpaper prepared by QHR for Dallas/Fort Worth Medical Center, QHR recognized that this amount was improperly submitted to Medicare and reserved 40% of it to pay Medicare in the event this improper submission were detected.

261.   The reserve workpaper states that the bad debts "were determined to include HBP [Hospital-Based Physician] fee write offs." This workpaper is stamped "**CONFIDENTIAL.  Do Not Discuss or Release to Medicare Auditors.**" It is attached as Exhibit 25 and is incorporated by reference herein

262   Providers are required to use "reasonable collection efforts" to collect bad debts, to show that the debt was uncollectible, and to show that there is no likelihood of future recovery before they may bill Medicare for bad debts.  42 C.F.R. § 413.80(e).

263.   HCFA has interpreted these requirements, through the PRM.  "To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect

comparable amounts from non-Medicare patients." PRM § 310.

264    "The provider's collection effort should be documented in the patient's file by copies of the bill(s), followup letters, reports of telephone and personal contact, etc." PRM § 310(B).

265.   Medicare providers also may declare debts uncollectible by determining that the patient is indigent or medically indigent, but are required to document that determination. This documentation should include the method used to make such determination and the information used to substantiate it   PRM § 312.

266    Based on the information available in the attached exhibits and known company policy and practice, defendants knowingly violated the rules described in ¶¶ 262-265.

267.   As an example, in a cost report for the Bascom Palmer Eye Institute for the year ending May 31, 1992 prepared by defendant QHR, the hospital claimed reimbursement from Medicare for $305,434 in uncollectible bad debts.

268.   On a reserve workpaper  prepared by QHR for Bascom Palmer Eye Institute on August 20, 1992, however, QHR  reserved for 80% of the $305,434 claimed for bad debts The QHR consultant determined that the cost report included claims for debts due to patients' indigency, despite a lack of the requisite documentation.  This reserve workpaper is attached as Exhibit 26 and is incorporated by reference herein.

## XIX.   IMPROPER STATISTICS

269.   Overhead (indirect) costs are those costs that are necessary for hospital operations, but cannot directly be associated with the rendering of a particular service.

270   Overhead (indirect) costs include departments that usually benefit several or all areas of the hospital.  Examples of indirect costs include housekeeping, laundry, operation of plant, maintenance, dietary, and indirect medical education costs of interns and residents in a teaching hospital.  PRM § 2302.9.

271.   Overhead (indirect) costs are by definition not capable of being charged based on actual usage, but instead must be allocated based on a statistic that measures the benefit received by each cost center.  PRM §§ 2300.4.B and 2307.

272.   Statistical bases for allocation of indirect costs include square footage, poundage of laundry, and meals served

273.   Medicare requires that any changes in statistical bases for allocation of indirect costs be explicitly approved prior to the beginning of a fiscal year.  PRM § 2313.

274   The allocation statistics for indirect costs must include statistics for areas that are not reimbursed by Medicare.  These areas are called "non-reimbursable cost centers "  PRM § 2306.

275.   Based on the information available in the attached exhibits and known company policy and practice, defendants often failed to use the correct statistical bases to allocate indirect costs.

276.   Based on the information available in the attached exhibits and known

company policy and practice, defendants often knew that they possessed the necessary statistics for non-reimbursable cost centers, but chose not to record those statistics, and to use estimates based on prior years instead.

277.   In a cost report for the Bascom Palmer Eye Institute for the year ending May 31, 1991 prepared by defendant QHR, the hospital claimed reimbursement from Medicare for indirect costs of the maintenance department.

278   On reserve workpapers prepared by QHR for Bascom Palmer Eye Institute for the 1991 cost report, however, QHR reserved $39,823 for use of the prior year allocation amounts to file the maintenance statistic.  The QHR consultant determined that changes from the prior year to the current year allocation amounts "resulted in change in allocation unfavorable to client" so the QHR consultant used the prior year allocation on the filed cost report and established a reserve for the current year allocation.  The reserve workpapers are attached as Exhibit 27 and are incorporated by reference herein.

279.   As another example, in a cost report prepared for Dallas/Fort Worth Medical Center by QHR for the cost year ending October 31, 1991, the hospital claimed reimbursement for indirect medical education costs (costs of interns and residents in a teaching hospital) using a bed count of 124 beds.

280.   Plaintiffs allege upon information and belief that when QHR prepared the 1991 Dallas/Fort Worth Medical Center cost report QHR knew that the proper bed count should have been 204 beds, but used 124 beds instead in order to increase Medicare reimbursement by $318,736.

281.   On a reserve workpaper prepared by QHR for the 1991 Dallas/Fort Worth Medical Center cost report, the QHR consultant explained that "[e]ffective 11-1-87 the alcohol and drug unit beds of 80 rolled into DRG reimbursement. . . . According to the regs the 80 beds should be included in the count even though the I&R's do not rotate thru the unit." (emphasis in original). See reserve workpaper attached hereto as Exhibit 28 and incorporated by reference herein. The same workpaper also noted that "the 10-31-88 report was settled using the 204 beds since that's how we filed the report." Exhibit 28.

## XX.   NON-REIMBURSABLE COST CENTERS

282.   Overhead costs are properly allocated to both reimbursable cost centers and non-reimbursable cost centers through the step-down method of cost allocation. 42 C.F.R § 413.24(d)(1).

283   There is an exception to this rule where the costs attributable to the non-reimbursable area "are so insignificant as to not warrant establishment of a non-reimbursable cost center," PRM § 2328D, in which case the non-reimbursable costs may be reported as adjustments to expenses.

284.   Based on the information available in the attached exhibits and known company policy and practice, defendants often knowingly failed to set up appropriate non-reimbursable cost centers for a variety of non-reimbursable functions that should have been accounted for in that way because the costs attributable to them were not insignificant.

285.   By not setting up a non-reimbursable cost center, more overhead costs were allocated to cost centers that are reimbursed by Medicare than was accurate. Therefore,

Medicare was overcharged for hospital overhead costs whenever a non-reimbursable cost center was not established on defendants' owned and managed hospitals' cost reports where a non-reimbursable cost center should have been established.

286    Based on the information available in the attached exhibits and known company policy and practice, defendants routinely established non-reimbursable cost centers in their reserve cost reports and reserve workpapers, thus demonstrating that they knew which cost centers should be set up as non-reimbursable.

287.   Areas in which defendants knowingly failed to set up non-reimbursable cost centers include, but are not limited to: physician office buildings owned by the hospital where physicians have their private offices,  gift shops, catering, guest meals, public relations and marketing.

288.   For example, in a cost report submitted by Parkview Regional Medical Center for the cost year ending June 30, 1991, the hospital claimed reimbursement from Medicare for costs of its retail pharmacy, which are costs that are not eligible for reimbursement by Medicare.

289    Plaintiffs allege upon information and belief that Quorum knew that the retail pharmacy costs should have been set up as a non-reimbursable cost center

290    On a "reserve workpaper" prepared for Parkview's 1991 cost report, Quorum recognized that Parkview should have set up the retail pharmacy as a non-reimbursable cost center in order to avoid overcharging Medicare for overhead costs associated with the 150 square feet of hospital space that the retail pharmacy occupied.  See reserve workpaper

attached hereto as Exhibit 29 and incorporated by reference herein.

291    As a result of the misrepresentation alleged in ¶¶ 288-290, Medicare was induced to pay Parkview an amount of $16,910 which it otherwise would not have paid but for the false representation of QHG and its subsidiaries

292.    For example, in a cost report submitted by Parkview Regional Medical Center for the cost year ending June 30, 1992, the hospital claimed reimbursement from Medicare for costs of its Medical Office Building ("MOB").  On the filed cost report, Parkview did not set up the MOB as a non-reimbursable cost center.

293.    Plaintiffs allege, upon information and belief, that during the 1992 cost report year the MOB for Parkview was occupied primarily by physicians' private offices.

294    Plaintiffs allege, upon information and belief, that Quorum knew that because physicians' private offices are not space related to the hospital's patient care, the MOB should be set up as a non-reimbursable cost center on the hospital cost report.

295.    Indeed, on a reserve workpaper created for Parkview's 1992 cost report, there is an entry that reads, "Remove M.O.B. A-8's — Set up Non Reimb CC."  A reserve was established for $53,393 in the event that the fiscal intermediary caught the misrepresentation that the MOB was used for hospital patient care and made an adjustment to set up the MOB as a non-reimbursable cost center.  See reserve workpaper attached hereto as Exhibit 30 and incorporated by reference herein.

296    As a result of the misrepresentation alleged in ¶¶ 292-295, Medicare was induced to pay Parkview an amount of $53,393 that it otherwise would not have paid but for

the false representation of QHG and its subsidiaries.

297.   In the process of allocating overhead costs to reimbursable and non-reimbursable cost centers, costs in a non-reimbursable cost center generally cannot be reduced by revenue generated by that cost center.  PRM  § 2328.

298.   Based on the information available in the attached exhibits and known company policy and practice, defendants violated the rule explained in ¶ 297

299   Based on the information available in the attached exhibits and known company policy and practice, when defendants set up non-reimbursable cost centers on their hospital cost reports, they often reduced the expense in each non-reimbursable cost center by the amount of the income earned by that non-reimbursable cost center.  This entry either significantly reduced the costs in a non-reimbursable cost center or eliminated them altogether.  By reducing the costs in a non-reimbursable cost center, defendants lowered the amount of overhead attributable to that non-reimbursable cost center.  As a result, Medicare was overcharged for overhead costs on reimbursable cost centers.

## XXI.   MANIPULATION OF COST CENTERS

300.   A cost center is an organizational unit, generally a department or a subunit, having a common function for which direct and indirect costs are accumulated, allocated and apportioned.  PRM § 2302.8.  If a provider has properly identified and accounted for a cost center, that cost center must be reported separately on the cost report.  Arbitrary combining of cost centers for the purpose of enhancing reimbursement is not allowed.  If a department meets the definition of a cost center as set out in the regulations, and the provider has done

the necessary record keeping, the cost center must be reported separately.

301    Based on the information available in the attached exhibits and known company policy and practice, defendants often knowingly combined cost centers improperly to increase reimbursement.

302.    Based on the information available in the attached exhibits and known company policy and practice, defendants' reserve analyses indicated that they had the data available to treat departments separately, as the PRM requires.

303.    For example, in a cost report prepared by QHR employees Bob Pert and Chris Prucha for Doctor's Hospital of Groves, Texas for the cost year ending December 31, 1991, the hospital claimed reimbursement for drugs and IV (intravenous) in a single cost center in order to increase Medicare reimbursement

304.    Plaintiffs allege upon information and belief that QHR knew at the time that it prepared the 1991 Doctor's Hospital cost report that the hospital had the necessary information to separate drugs and IV into two separate cost centers.

305.    In a reserve cost report workpaper, QHR coordinator Bob Pert established a reserve of $9,908 in the event that Medicare auditors caught the misrepresentation described in ¶¶ 303-304.  See reserve workpaper attached hereto as Exhibit 31 and incorporated by reference herein.

306.    Similarly, providers cannot separate out cost centers that do not meet the regulatory definition of a cost center simply to enhance Medicare reimbursement.

307    Based on the information available in the attached exhibits and known

-64-

company policy and practice, defendants separated out cost centers that did not qualify as separate cost centers under the regulations simply to enhance Medicare reimbursement.

308.   For example, in a cost report prepared by QHR prepared by QHR employees Bob Pert and Chris Prucha for Doctor's Hospital of Groves, Texas for the cost year ending December 31, 1991, the hospital claimed reimbursement for separate cost centers for cardiac, EKG and EEG

309   Plaintiffs allege upon information and belief that QHR knew when it prepared the cost report that the hospital had not maintained adequate records to support the separation of the cardiac cost center into three cost centers — cardiac, EKG, and EEG — but nevertheless separated out the cost centers on the cost report to increase the hospital's Medicare reimbursement.

310.   In a reserve workpaper created by QHR coordinator Bob Pert for Doctor's Hospital of Groves for 1991, a reserve was established for the possibility that Medicare auditors would require the hospital to combine the cardiac, EKG and EEG cost centers into one   See reserve workpaper attached hereto as Exhibit 31, and incorporated by reference herein.

## XXII.   ADDITIONAL EXHIBITS TO PLAINTIFFS' COMPLAINT

311.   Attached hereto at Exhibits 32-196, and incorporated herein by reference, are reserve workpapers for the hospitals and years listed on the Index of Exhibits for Exhibit numbers 32-196. These Exhibits provide further examples typical of defendants' policy and practice of submitting false cost report claims. Exhibits 32-196 are reserve workpapers for

some of the hospitals owned by Quorum or managed by HCA Management Company and its

successor, QHR, which are the subject of this complaint.

312.   Plaintiffs allege, upon information and belief, that all of the reserve items

highlighted in yellow or contained within a yellow highlighted box on Exhibits 32-126

evidence the inclusion in those hospitals' filed cost reports of false statements and false claims

for those items.  Reserve cost report workpapers from over 400 cost years for 165 hospitals

owned or managed by Quourm are contained in Exhibits 32-196.  The total amount of the

reserve issues highlighted therein exceeds $70,000,000.  Plaintiffs sue in this complaint for

false claims and false statements made by 178 hospitals managed by Quorum and its

predecessor, HCA Management Company from 1985-1995, an eleven-year period, plus 35

hospitals owned by Quorum for between two months and eight years.

313.   On Exhibits 32-196, where there are on the same page highlighted reserve

items and reserve items that are not highlighted, plaintiffs make no claim for the reserve items

not highlighted.

314.   Plaintiffs allege, based upon the corporate policy and practice described at

¶¶ 68-75 above, that all hospitals managed by HCA Management Company and its successor

QHR listed on Exhibit 5 submitted cost reports for all years that they were managed by HCA

Management Company and/or QHR that made false statements and false claims that were

evidenced in the reserve cost reports and workpapers that HCA Management Company

and/or QHR and/or their outside consultants prepared for those hospitals.  Plaintiffs sue with

respect to all such false statements and false claims in cost reports relating to cost years

ending on or after January 1, 1985, and through cost years ending on December 31, 1995, whether or not those false statements and false claims appear in the exhibits attached hereto or are cited among the examples listed in the text of this complaint.

315.   Plaintiffs allege, based upon the corporate policy and practice described at ¶¶ 68-75 above, that, with respect to each managed hospital for which HCA Management Company and/or QHR prepared reserve cost reports and/or reserve workpapers, HCA Management Company and/or QHR identified among its reserve items claims included in the filed cost reports that it knew where not properly subject to reimbursement.

316.   Plaintiffs allege, based upon the corporate policy and practice described at ¶¶ 75-79 above, that all hospitals owned by Quorum made false statements and false claims that were evidenced in the reserve cost reports and workpapers that Quorum and/or its outside consultants prepared for those hospitals.  Plaintiffs sue with respect to all such false statements and false claims in cost reports submitted for all Quorum-owned hospitals, whether or not those false statements and false claims appear in the exhibits hereto or are cited among the examples listed in the text of this complaint.

## XXIII. DAMAGES

317   As set forth above, defendants knowingly submitted or caused to be submitted untruthful, incorrect or incomplete hospital cost reports to Medicare and Medicaid containing false certifications that the cost reports were true, correct and complete, in violation of 31 U.S.C. § 3729.

318.   As set forth above, defendants knowingly submitted or caused to be submitted

untruthful and inaccurate Requests for Reimbursement to TRICARE/CHAMPUS containing false certifications that the requests were accurate and based on the hospitals' Medicare cost report.

319.   Defendants' false certifications of completeness damaged the Government to the extent that defendants reserved for non-reimbursable costs.  Defendants' false certifications of truthfulness, correctness and accuracy damaged the Government because they necessarily involved non-reimbursable costs.

320   The United States did not know and could not reasonably have known, before December 1992, of the facts material to the causes of action pled in this complaint.

## CLAIMS

### FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

321.   Plaintiffs the United States and Relator repeat and reallege each allegation in ¶¶ 1 through 320, as if fully set forth herein.

322.   Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

323   By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation

## SECOND CAUSE OF ACTION

(False Claims Act: Making or Using False Record or Statement)
(31 U.S.C. § 3729 (a)(2))

324    Plaintiffs the United States and Relator repeat and reallege each allegation in ¶¶ 1 through 320, as if fully set forth herein.

325.    Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States

326.    By virtue of the false records or statements made by the defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## THIRD CAUSE OF ACTION

(False Claims Act: Reverse False Claims)
(31 U.S.C. § 3729(a)(7))

327.    Plaintiffs the United States and Relator repeat and reallege each allegation in ¶¶ 1 through 320, as if fully set forth herein.

328.    Defendants knowingly made, used or caused to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States.

329.    By virtue of the false records or statements made by the defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

330.    Plaintiff the United States repeats and realleges each allegation in ¶¶ 1 through 320, as if fully set forth herein.

331.    This is a claim for the recovery of monies by which all defendants except QHR have been unjustly enriched.

332.    By directly or indirectly obtaining Government funds to which they were not entitled, all defendants except QHR were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States

## FIFTH CAUSE OF ACTION

### (Payment By Mistake)

333.    Plaintiff the United States repeats and realleges each allegation in ¶¶ 1 through 320, as if fully set forth herein.

334    This is a claim for the recovery of monies paid by the United States to the defendants as a result of mistaken understandings of fact.

335    The false claims which all defendants except QHR submitted to the United States' agents were based upon mistaken or erroneous understandings of material fact

336.    The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the claims, paid all defendants except QHR certain sums of money to which they were not entitled, and defendants are thus liable to account and

-70-

pay such amounts, which are to be determined at trial, to the United States.

## SIXTH CAUSE OF ACTION

(Disgorgement of Illegal Profits)

337    Plaintiff the United States repeats and realleges each allegation in ¶¶ 1 through 320, as if fully set forth herein.

338.    By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by the Medicare, Medicaid and TRICARE/CHAMPUS programs as a result of defendants' actions alleged herein, disgorgement of all profits obtained by defendants through the submission of inflated Hospital Cost Reports and Requests for Reimbursement, and/or imposition of a constructive trust in favor of the United States upon those profits

339.    Defendants made such false, fictitious or fraudulent statements, reports and claims to the United States to obtain illegal profits from the Medicare, Medicaid and TRICARE/CHAMPUS programs, and equity requires the disgorgement of such profits and their payment to the United States.

## SEVENTH CAUSE OF ACTION

(Common Law Fraud)

340.    Plaintiff the United States repeats and realleges each allegation in ¶¶ 1 through 320, as if fully set forth herein.

341.    Defendants made material and false representations in their filed Hospital Cost Reports and Requests for Reimbursement with knowledge of their falsity or reckless disregard

for their truth, with the intention that the Government act upon the misrepresentations to its detriment.  The Government acted in justifiable reliance upon defendants' misrepresentations by settling defendants' owned Hospital Cost Reports at an inflated amount.

342.   Had the true facts been known to plaintiff the United States, all defendants except QHR would not have received payment of the inflated amounts.

343   By reason of its inflated payments, plaintiff the United States has been damaged in an as yet undetermined amount.

## EIGHTH CAUSE OF ACTION

### (Common Law Recoupment)

344.   Plaintiff the United States repeats and realleges each allegation in ¶¶ 1 through 320, as if fully set forth herein.

345.   This is a claim for common law recoupment, for the recovery of monies unlawfully paid by the United States to all defendants except QHR contrary to statute or regulation.

346.   The United States paid all defendants except QHR certain sums of money to which they were not entitled, and defendants are thus liable under the common law of recoupment to account and return such amounts, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States and Relator demand and pray that judgment be entered in favor of them as follows.

1.      On the First, Second and Third Causes of Action under the False Claims Act, as amended, for the amount of the United States' damages, multiplied as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States as follows:

1.      On the Fourth, Fifth, and Eighth Causes of Action, for unjust enrichment, payment by mistake, and common law recoupment, for the damages sustained and/or amounts by which the defendants were unjustly enriched or by which defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

2.      On the Sixth Cause of Action, for disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by defendants and all such further equitable relief as may be just and proper.

3.      On the Seventh Cause of Action, for common law fraud, for compensatory and punitive damages in an undetermined amount, together with costs and interest, and for all such further relief as may be just and proper

-73-

Respectfully submitted,

For the United States:

**DAVID W. OGDEN**
Acting Assistant Attorney General

**CHARLES R. WILSON**
United States Attorney

**MICHAEL F. HERTZ**
**JOYCE R. BRANDA**
**ARNOLD M. AUERHAN**
**DAVID M. GOSSETT**
Attorneys, Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Telephone: 202/ 307-0278
Fax: 202/ 616-3085

**JAY G. TREZEVANT**
Assistant United States Attorney
Florida Bar No 802093
400 N. Tampa Street
Suite 3200
Tampa, Florida 33602
Telephone  813/ 274-6076
Fax  813/ 274-6198

Date: February 24, 1999

For Relator James F. Alderson:

**W. CHRISTIAN HOYER**
Trial Counsel
Florida Bar No  0162703
James, Hoyer, Newcomer, Forizs &
Smiljanich, P.A
One Urban Center, Suite 147
4830 West Kennedy Blvd.
Tampa, Florida 33609
Telephone:  813/ 286-4100
Fax:  813/ 286-4174

**PETER W. CHATFIELD**
Philips & Cohen
2000 Massachusetts Ave., N.W.
First Floor
Washington, D.C. 20036
Telephone:  202/ 833-4567
Fax:  202/ 833-1815

**STEVEN L. MEAGHER**
Philips & Cohen
131 Steuart Street
Suite 501
San Francisco, California 94105-1230
Telephone:  415/ 836-9000
Fax:  415/ 836-9001

-74-